VUKASOVICH, INC.,
Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

VUKASOVICH, INC.,
Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 85–7256, 85–7326.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 1986.

Decided June 2, 1986.

John F. Hopkins, Hopkins, Mitchell & Carley, San Jose, Cal., for petitioner-appellee.

Teresa E. McLaughlin, Dept. of Justice, Washington, D.C., for respondent-appellant.

Before GOODWIN, HUG, and REINHARDT, Circuit Judges.

GOODWIN, Circuit Judge:

As part of a settlement of disputes arising out of a cattle-feeding agreement, Vukasovich, Inc. paid approximately $212,000 to Sunset Cattle Co., which in turn agreed to pay $200,000 to Coit Ranch, to which Vukasovich owed $237,000. The Commissioner appeals from the Tax Court's holding that Vukasovich did not realize $37,000 in income from the cancellation of indebtedness. Vukasovich cross-appeals from the Tax Court's finding that the payment was a nondeductible repayment of a loan rather than a deductible settlement. We reverse the Tax Court's decision that Vukasovich

did not realize income from the cancellation of its indebtedness and affirm its finding that the three-party arrangement was in substance the repayment of a loan.

## Background

The taxpayer, Vukasovich, Inc., bought cattle from Coit, which agreed to fatten the cattle for market. The taxpayer paid approximately $400,000 directly to Coit. The remaining money for the investment was advanced by Crocker National Bank under a $2.1 million dollar line of credit to the taxpayer, guaranteed by Coit. The taxpayer prepaid interest and feed costs, partly with Crocker loans and partly with its advance. Sunset acted as the taxpayer's agent for the transaction.

The transaction was entered into on August 24, 1973, and the taxpayer's tax year ended August 31. The taxpayer deducted immediately $100,000 prepaid interest, and $700,000 for the feed. The taxpayer did not immediately deduct from 1973 income the $1.6 million purchase price of the cattle, but did report it in connection with the sale of cattle.

The next year, the cattle were sold for about $1.8 million. The taxpayer reported the gain over the purchase price. The taxpayer forwarded the proceeds of the sale to Crocker, which were nonetheless insufficient to repay the full amount advanced under the line of credit. Coit, pursuant to its guarantee, paid Crocker the $237,000 difference.

In a subsequent year, the taxpayer sued Coit for rescission of the contract. Coit counterclaimed on the taxpayer's note to Crocker, having been assigned the note when it paid Crocker pursuant to its guarantee. The parties settled the suit. The taxpayer agreed to pay Sunset $212,000 in installments with interest. Sunset promised Coit that it would remit installments of identical amounts, except for the last, to Coit. The taxpayer guaranteed Sunset's payments to Coit. Coit collected $200,000, plus interest. The other $12,000 went to Sunset. That amount approximated the sum Sunset would have earned under its agency contract. The parties released one another from all claims.

On its return, the taxpayer deducted its $212,000 payment as a business expense, describing it as the settlement of a disputed claim. It did not report the cancellation of its loan debt as income. The Commissioner challenged both these claims.

The Tax Court characterized the settlement as the repayment of a loan and disallowed the business expense deduction. It also held that the doctrine of *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926), required that the cancellation of the loan debt not be held income. The court also rejected the Commissioner's claim that the tax-benefit rule required the inclusion of the $37,000 as income.

## Scope of Review

We review facts, including inferences made from a stipulated record, only for clear error. *See Church by Mail, Inc. v. Commissioner,* 765 F.2d 1387, 1390 (9th Cir.1985). The taxpayer's assertion that review is de novo relies on such cases as *Sennett v. Commissioner,* 752 F.2d 428, 430 (9th Cir.1985). However, these cases involved no factual disputes, leaving the Tax Court only the task of applying the law. *Church by Mail,* 765 F.2d at 1390.

The Commissioner and the taxpayer agree that the Tax Court's decision that there was no income from the cancellation of indebtedness is reviewable as a question of law. However, ambiguity in this circuit's case law has obscured the scope of review of Tax Court decisions on questions of law. One set of decisions apparently reviews Tax Court decisions only for "unmistakable error" of law. *See First Charter Financial Corp. v. United States,* 669 F.2d 1342, 1345 (9th Cir.1982) (de novo review, but this court will disagree with Tax Court only if "unmistakable question of law so mandates"); *Merlino v. Commissioner,* 660 F.2d 415, 416 (9th Cir.1981); *Carnation Co. v. Commissioner,* 640 F.2d 1010, 1012 (9th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981); *Estate of Simmie v. Commissioner,* 632

F.2d 93, 94 (9th Cir.1980); *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d 670, 674 (9th Cir.1980); *Sibla v. Commissioner*, 611 F.2d 1260, 1262 (9th Cir. 1980).

Another set of decisions reviews Tax Court decisions without reciting any special deference to the Tax Court's expertise in tax law. *See Bolaris v. Commissioner*, 776 F.2d 1428, 1431 (9th Cir.1985); *Bolker v. Commissioner*, 760 F.2d 1039, 1041–42 (9th Cir.1985); *Schneier v. Commissioner*, 735 F.2d 375, 376 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 962, 83 L.Ed.2d 967 (1985); *Wein Consolidated Airlines, Inc. v. Commissioner*, 528 F.2d 735, 737 n. 1 (9th Cir.1976). *Bolaris* relies on *Dumdeang v. Commissioner*, 739 F.2d 452, 453 (9th Cir.1984), in which the only issue was the Tax Court's decision that the revenue code's definition of dependent was constitutional. *Bolker* cites *California Federal Life Insurance Co. v. Commissioner*, 680 F.2d 85, 87 (9th Cir.1982), which cites two cases, *Cruttenden v. Commissioner*, 644 F.2d 1368, 1374 (9th Cir.1981), which itself states the unmistakable question rule of *Sibla* and progeny, and *Allstate Savings and Loan Association v. Commissioner*, 600 F.2d 760, 762 (9th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980), which states that the Tax Court should receive substantial deference in the resolution of technical issues affecting a single industry. While *Allstate* was decided without citation of authority, the reasoning follows *Dobson v. Commissioner*, 320 U.S. 489, 501–02, 64 S.Ct. 239, 246–47, 88 L.Ed. 248 (1943). *Schneier* cites only *Confederated Tribes v. Kurtz*, 691 F.2d 878, 880 (9th Cir.1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983), which held only that the district court's decision would be reviewed de novo. *Wien* cites only 26 U.S.C. § 7482(a) (1982).

One recent Ninth Circuit decision holds that we review de novo but accord decisions of the Tax Court special respect. *See Magneson v. Commissioner*, 753 F.2d 1490, 1493 (9th Cir.1985). It relies on *California Federal Life Insurance.*

The conflict apparently results from seemingly contradictory statutes. 26 U.S.C. § 7482(a) (1982) provides that we review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury," which implies de novo review. Section 7482(c)(1) instructs us to reverse decisions "not in accordance with law," a standard akin to those used in reviewing administrative agencies. *See* 5 U.S.C. § 706(2)(A) (1982). *Dobson*, which reviews Tax Court decisions deferentially, was decided before § 7482(a) became law and interprets the predecessor statute to § 7482(c)(1). *See* 320 U.S. at 497 & n. 21, 64 S.Ct. at 244 & n. 21 (citing Revenue Act of 1926, Pub.L. No. 69–020, § 1003(b), 44 Stat. 9, 110). *Dobson* reasoned that Congress' changing the Board of Tax Appeals to the Tax Court was a sign of congressional approval of the court's work, so that greater deference should be paid to its conclusions. 320 U.S. at 496–99, 64 S.Ct. at 244–45. The Tax Court's expertise and the uniformity of its decisions provided further reason for deferring to the Tax Court. 320 U.S. at 498–500, 64 S.Ct. at 245–46.

Actually, congressional intent in conferring more independence on the Tax Court seems to have been directed at making it function as a court, deciding cases based on judicial reasoning rather than administrative discretion. The Commissioner has the power to promulgate regulations and is to be relied upon for any discretionary decisions based on administrative expertise or political judgments. *See* 26 U.S.C. § 7805(a) (1982); *National Muffler Dealers Association v. United States*, 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1306–07, 59 L.Ed.2d 519 (1979). Uniformity is provided by deference to the Commissioner. *See National Muffler Dealers Association*, 440 U.S. at 476–77, 99 S.Ct. at 1306–07. In any case, Congress's provision for review of the Commissioner's decisions in the district courts, 28 U.S.C. § 1346(a)(1) (1982), suggests that uniformity in tax law is less important than in those areas where Congress gives a centralized administrative

agency exclusive jurisdiction. After *Dobson,* the House draft codifying Title 28 placed the Tax Court in the judicial code. *See* H.R. 3214, 80th Cong., 2d Sess. (1948). The Senate rejected this in the interest of avoiding controversy. S.Rep. No. 1559, 80th Cong., 2d Sess. 2 (1948). However, the Senate agreed that criticism of *Dobson* was unanimous. *Id.* For these reasons, Congress decided to overrule *Dobson. See id.* at 2, 13; Act of June 25, 1948, ch. 646, § 36, 62 Stat. 869, 991–92, *amending* 26 U.S.C. § 1141(a), *recodified as* 26 U.S.C. § 7482(a)(1982).

■ Those cases holding that we review de novo Tax Court decisions on questions of law are consistent with the intent underlying § 7482(a). The frequent recitations of special deference are apparently mutations that this court has ignored when we disagree with the tax court. *Cf. Allstate,* 600 F.2d at 762 (reciting substantial deference rule but analyzing the issues independently). To the extent that expressions of deference in reviewing questions of law are harmless honorifics among fellow judges, they waste ink. To the extent that they sow confusion, they are best ignored.

We do not suggest that Tax Court decisions on questions of law are not entitled to respectful review. The legal conclusions of all courts are entitled to respect. *First Charter*'s holding that uniformity among the circuits is especially important in tax cases, so the court would "hesitate to reject the rule of another circuit," 669 F.2d at 1345, suggests that Tax Court decisions should receive deference in the interest of a uniform body of national tax law. This is especially so when "it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (Brandeis, J., dissenting) (1932). Similar benefits may be attributable to the Tax Court's expertise, especially on narrow technical questions. *See Allstate,* 600 F.2d at 762. However, the benefits of uniformity and expertise depend on the issue disputed. Legal conclusions are either right or

wrong. So-called "mixed questions of law and fact" create their own special problems. This is not a "mixed question" case. A general rule of special deference to the Tax Court is inappropriate although its judgments in its field of expertise are always accorded a presumption that they correctly apply the law.

### The Settlement as Repayment of a Loan

The Tax Court found that the settlement was actually the repayment of a loan because Sunset was merely forwarding the taxpayer's payments to Coit. The Tax Court applied correct legal principles to established facts: (1) the identity in the timing and the amount of the payments; (2) the absence of any reason for Sunset to pay anything to Coit; (3) the absence of any reason for the taxpayer to pay Sunset any sum greater than the $12,000 fee Sunset actually kept; (4) the taxpayer's guarantee of Sunset's payments to Coit; and (5) the extinguishment of the taxpayer's debt to Coit.

■ The taxpayer argues that the Commissioner stipulated that the settlement was not the repayment of the loan. However, the Commissioner stipulated only to the terms of the settlement, which contains self-serving language. The Commissioner did not stipulate to the truth of these assertions nor to their meaning. The Tax Court and the Commissioner were entitled to examine the substance of the transaction.

■ Deference to the Tax Court's findings extends to inferences the Tax Court makes from undisputed fact. The substance of this transaction was the repayment of taxpayer's borrowings. The Tax Court did not err in so finding.

### Income from Cancellation of Indebtedness

When a taxpayer borrows money, the loan proceeds are not income. Nor are repayments of a loan deductible from income. However, when one settles a claim based on a loan for less than the amount of the loan, one ordinarily realizes income

from the cancellation of indebtedness.[1] *See* 26 U.S.C. § 61(a)(12) (1982).

■ In the pending case, taxpayer borrowed $237,000, used the money to pay expenses for which deductions were taken, and then settled the loan for $200,000. We conclude that the $37,000 the taxpayer gained by the cancellation is income within the meaning of 26 U.S.C. § 61(a) (1982), providing that "gross income means all income from whatever source derived, including ... [i]ncome from discharge of indebtedness ...."

In not reporting the gain as income, the taxpayer relied on *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926). *Kerbaugh-Empire* dealt with a corporation that had borrowed German marks, lost money on the underlying transaction, but paid back the loan in a subsequent year with devalued marks that cost less to purchase in American money. The Court held that the difference between the purchase price of the marks and the repayment was not income, but merely a reduction of the loss on the underlying transaction, and so was not taxable.

The taxpayer in the pending case also lost money on the underlying transaction. The Commissioner concedes that *Kerbaugh-Empire* is difficult to distinguish, but argues that the Supreme Court has implicitly overruled it.

*Kerbaugh-Empire* depended on two premises. First, it held that the cancellation of indebtedness was not income, because income was "gain derived from capital, from labor, or from both combined." *Id.* at 174, 46 S.Ct. at 451. Second, it held that a unitary transactional approach to measuring income made it impermissible to look at receipts in a given year without determining whether they were offsets of losses in another year because while "the [loan] in question is cash gain[,] ... the borrowed money was lost." *Id.* at 175, 46 S.Ct. at 451. The Commissioner relies primarily on *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931); *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); and *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), to show that these premises are no longer accepted.

Ordinarily the cancellation of indebtedness is gross income. *Kerbaugh-Empire*'s reluctance to tax income from the cancellation of indebtedness stemmed in part from *Eisner v. Macomber*, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920) (quoting *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054 (1918)), which defined income for the purposes of the Sixteenth Amendment as " 'the gain from capital, from labor, or from both combined.' " Because the cancellation of indebtedness could not be attributed to a gain from capital or labor, the result in *Kerbaugh-Empire* followed from the then-existing interpretation of the Sixteenth Amendment. *See Kerbaugh-Empire*, 271 U.S. at 174–75, 46 S.Ct. at 451. Since then, *Glenshaw Glass* has defined gross income in terms of "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431, 75 S.Ct. at 476. *Vukasovich* makes no argument that it has not received "income" as that term is defined in the Sixteenth Amendment. The taxpayer's position is therefore that *Kerbaugh-Empire*, a constitutional case, should be applied as a matter of statutory interpretation, though it is no longer good constitutional law. This approach to statutory interpretation does not commend itself, especially after *Glenshaw Glass*'s holding that the phrasing of the statute, essentially unchanged since that case, indicated Congress intent to "tax all gains except those specifically

---

**1.** There are statutory exceptions to this rule. *See* 26 U.S.C. § 108 (1982). In addition, if the cancellation comes under one of the general exclusions from income, *see* 26 U.S.C. §§ 101– 132 (1982 & Supp. II 1984), the cancellation comes under the general rule of exclusion. These exceptions are inapplicable.

exempted." 348 U.S. at 430, 75 S.Ct. at 476.

Moreover, the Supreme Court's treatment of subsequent statutory cases suggests that the taxpayer's approach has already been rejected. In *Kirby Lumber,* a company sold its bonds and later repurchased them for less than the sale price. The Supreme Court held that the taxpayer achieved a taxable gain through the freeing of its assets from the obligation to repurchase the bonds at the price of issue, and therefore realized income. *Kirby Lumber* shows that an increase in net worth from the discharge of indebtedness for less than the amount loaned is income, at least to the extent that it frees up the debtor's assets. Thus, the taxpayer's gain on the loan must be counted as income in the absence of something exceptional about the underlying transaction.

In *Tufts,* the taxpayer sold property subject to a nonrecourse mortgage. The property was worth less than the amount of the mortgage. Because the mortgage was nonrecourse, it could not be said, as it had been in *Kirby Lumber,* that the removal of the debt freed or enhanced the taxpayer's assets. Nonetheless, the Supreme Court ruled that the Commissioner could treat the difference between the initial amount of the loan and the amount repaid as income from the sale of the property.

The Commissioner argues that *Tufts* supports a general rule making irrelevant whether assets were freed because the Court focusses on the receipt of money unbalanced by an obligation to repay, rather than on the nonrecourse nature of the obligation or on the taking of deductions. *See* 461 U.S. at 310 n. 8, 103 S.Ct. at 1832 n. 8. The Commissioner's argument is supported by some authority, *see* Bittker & Thompson, Jr., *Income From the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co.,* 66 Cal.L.Rev. 1159, 1165–66, 1176, 1182 (1978).

However, requiring some benefit to the taxpayer from the transaction creating the indebtedness explains such cases as *Commissioner v. Rail Joint Co.,* 61 F.2d 751 (2d Cir.1932), which held that no gain was realized when a corporation issued bonds as dividends and repurchased them at less than their face value, and *B.F. Avery & Sons, Inc. v. Commissioner,* 26 B.T.A. 1393 (1932), where a claim that cancellation of indebtedness should be treated as a reduction in the purchase price was analyzed according to whether prior tax benefits had resulted from the higher purchase price. *See generally* J. Sneed, *The Configurations of Gross Income* 322–27 (1967).

We have no doubt that an increase in wealth from the cancellation of indebtedness is taxable where the taxpayer received something of value in exchange for the indebtedness. Unlike *Tufts, Rail Joint* may not have provided an economic benefit to the taxpayer from the transaction, and the statement in *Tufts* may not apply to such cases. Because Vukasovich received money in exchange for the indebtedness, we need not determine the limits of *Tufts.* We decline to address the issue.

Because we have decided that the cancellation of Vukasovich's indebtedness is ordinarily income, we must decide whether the transactional approach of *Kerbaugh-Empire* survives to prohibit treating the cancellation of indebtedness as income where the cancellation occurs in a different year from the underlying transaction.

In *Sanford & Brooks,* the Court dealt with a contractor who lost money on a dredging contract but in a subsequent year won a suit for breach of warranty of the character of the material to be dredged. The contractor claimed that the money need not be reported because the contractor had lost money on the contract. The Supreme Court disagreed, holding that the necessity of an annual approach to accounting for income tax purposes was a practical necessity. Though the contractor was hurt by not being allowed to offset its losses against gains, such an injustice was inherent in a workable tax system. *Sanford & Brooks* shows that an annualized approach to income tax accounting is permissible, even though it may cause injustice in a

particular case.[2] The demise of the transactional approach justifies the Commissioner's decision that the taxpayer cannot match its losses on an underlying transaction against its gains on the loan.

*Tufts* demonstrates the deference accorded the Commissioner in deciding when to tax income. *See* 461 U.S. at 317, 103 S.Ct. at 1836. While the Commissioner might provide that the failure of a taxpayer to repay its loan justified disallowance of the deductions taken earlier, the Commissioner's decision to recognize income later is more convenient to administer, and the taxpayer cannot complain about the deferral of recognition of income from the time the deduction was taken to the time the indebtedness was cancelled.

While we agree with the Commissioner that *Kerbaugh-Empire* is inconsistent with the Supreme Court's latest decisions, the taxpayer argues that we must follow *Kerbaugh-Empire* in the absence of a Supreme Court decision specifically overruling it. However, the Supreme Court has long held that "a later decision in conflict with prior ones [has] the effect to overrule them, whether mentioned and commented on or not." *Asher v. Texas*, 128 U.S. 129, 132, 9 S.Ct. 1, 2, 32 L.Ed. 368 (1888). It continues to adhere to this view. *See, e.g., Hudgens v. NLRB*, 424 U.S. 507, 517–20, 96 S.Ct. 1029, 1035–36, 47 L.Ed.2d 196 (1976) (holding that *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), implicitly overruled *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968)). Following an obviously outdated Supreme Court decision gives effect to an old decision only at the cost of ignoring more recent decisions. It forces the Supreme Court to reverse lower court decisions following the older law, burdening both the Supreme Court and litigants. It also deprives the Supreme Court of the benefit of a contemporary decision on the merits by the Court of Appeals. *See Mack-*

*ey v. United States*, 401 U.S. 667, 680, 91 S.Ct. 1160, 1173, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring and dissenting); *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (Stevens, J., concurring in denial of certiorari). *See generally* H. Hart & A. Sacks, *The Legal Process* 617–20 (tent. ed. 1958); Comment, *Stare Decisis in Lower Courts: Predicting the Demise of Supreme Court Precedent*, 60 Wash.L.Rev. 87, 93–100 (1984).

■ We conclude that the courts of appeal should decide cases according to their reasoned view of the way Supreme Court would decide the pending case today. The classic statements of this doctrine are found in the opinions in *Spector Motor Service v. Walsh*, 139 F.2d 809 (2d Cir.), *vacated sub nom. Spector Motor Service v. McLaughlin*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). Judge Clark, joined by Judge Frank, held, "[O]ur function cannot be limited to a mere blind adherence to precedent. We must determine with the best exercise of our mental powers of which we are capable that law which in all probability will be applied to these litigants or to others similarly situated." 139 F.2d at 814. Judge Learned Hand disagreed about the result, but agreed on the appropriate standard.

> It is always embarrassing for a lower court to say whether the time has come to disregard decisions of a higher court, not yet explicitly overruled, because they parallel others in which the higher court has expressed a contrary view.... [T]he measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it.

*Id.* at 823 (L. Hand, J., dissenting). This view has been followed in subsequent cases, many involving important constitutional rights. *See, e.g., Barnette v. West Virginia State Board of Education*, 47 F.Supp. 251, 252–53 (S.D.W.Va.1942), *aff'd*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628

---

**2.** Any injustice is minimized by the possibility of carrying forward net operating losses, 26 U.S.C.A. § 172 (West 1978 & Supp.1986), and using accrual accounting. Vukasovich offset all

its losses against other income and apparently rejected accrual accounting so that it could retain the tax benefits of prepaying interest and feed that had not been accrued.

(1943); *United States v. Girouard,* 149 F.2d 760, 765 (1st Cir.1945) (Woodbury, J., dissenting), *rev'd,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). *Compare McCray v. Abrams,* 576 F.Supp. 1244 (E.D.N.Y.1983) (rejecting *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *aff'd on other grounds,* 750 F.2d 1113 (2d Cir.1984)); *with Batson v. Kentucky,* — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (rejecting *Swain*).

The taxpayer also argues that the recodification of the tax code in 1954 represents congressional acceptance of *Kerbaugh-Empire.* However, the doctrine of legislative reenactment is "an unreliable indicium at best." *Glenshaw Glass,* 348 U.S. at 431, 75 S.Ct. at 476. Holding otherwise would force Congress to decide a difficult issue that it could otherwise leave to the courts, perhaps preventing a needed simplification or revision of the law on other issues. Refusing to give weight to re-enactment is especially justified where, as here, there was considerable doubt as to the scope of the cancellation of indebtedness exemption at the time of re-enactment. Moreover, the legislative history shows that Congress rejected codification in favor of leaving the situation "to be settled according to rules developed by the courts." S.Rep. No. 1622, 83d Cong.2d Sess. 14, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4643.

## Conclusion

We affirm the Tax Court's finding that the settlement was the cancellation of indebtedness. We hold that when the accession to wealth resulting from the cancellation of indebtedness is otherwise income, *Kerbaugh-Empire* does not prevent the taxation of gain.

Affirmed in part, reversed in part.